















MEG

3:00-CV-1545 KINGRAY, INC V. NATIONAL BASKETBALL

*131*

*O*

FILED

JUN 18 2001

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KINGRAY, INC. d/b/a THE BEER HUNTER, a California corporation, *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>NATIONAL BASKETBALL ASSOCIATION, INC. *et al.*,<br><br>          Defendants. | Civil No. 00cv1545-L(BEN)<br><br>**ORDER RE: (1) DIRECTV, INC.'S MOTION TO DISMISS OR IN THE ALTERNATIVE, MOTION TO COMPEL ARBITRATION; AND (2) PLAINTIFFS' MOTION TO AMEND THE COMPLAINT**<br><br>[Docket Nos. 10, 96] |

        This matter comes before the Court on Defendant DirecTV, Inc.'s ("DirecTV") motion to dismiss or in the alternative, motion to compel arbitration, and Plaintiffs' motion to amend the Complaint. The Court finds these motions suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1).

**FACTUAL BACKGROUND**

        Plaintiffs, individuals and commercial establishments, have filed this lawsuit on behalf of commercial and residential purchasers of the "NBA League Pass," a satellite television subscription package that allows subscribers to view selected NBA basketball games ("out of market games") that they otherwise would not be able to view on broadcast or cable television. Plaintiffs purchase this subscription through DirecTV, a provider of satellite television

*131*

programming.  Plaintiffs allege the NBA League Pass violates federal and state antitrust laws and California's Unfair Competition Act.  Defendants are the National Basketball Association, Inc. ("NBA"), NBA Properties, Inc. ("NBA Properties"), DirecTV, and several professional basketball organizations.  These basketball organizations are: Chicago Professional Sports Limited Partnership; LAC Basketball Club; Royal Kings Limited Partnership, the Los Angeles Lakers, Inc., Jazz Basketball Investors, Inc., and Trail Blazers, Inc. (collectively referred to as the "NBA Teams.")  NBA, NBA Properties, and NBA Teams are hereinafter collectively referred to as "NBA Defendants."

The NBA is currently comprised of 29 independently owned and operated professional basketball teams that have joined the NBA to compete in its professional basketball league. (Complaint ¶ 39.)  Each of the 29 NBA Teams is franchised by the NBA and is an independent business entity.  (Complaint ¶ 40.)  Each NBA team competes with one another for, *inter alia*, the acquisition of players, coaches, and management personnel.  *Id.*  Each NBA team derives separate revenues from local television and radio, parking, concessions, and box seating.  *Id.* The NBA Teams do not share their expenses, profits, or losses.  *Id.*

Prior to the enactment of the Sports Broadcasting Act ("SBA"), collective agreements between professional sports leagues and broadcast television providers were found to be horizontal agreements in violation of the Sherman Antitrust Act ("Sherman Act").  (Complaint ¶ 33.)  Following the Eastern District of Pennsylvania's decision in *United States v. National Football League*, 196 F. Supp. 445 (E.D. Pa. 1961), professional sports leagues successfully lobbied for the SBA, which carves out an exemption for a clearly delineated class of such agreements.  *Id.*  Under the SBA, the antitrust laws "shall not apply to any joint agreement [concerning] organized professional team sports of football, baseball, basketball, or hockey." (Complaint ¶ 34.)

The NBA Teams have authorized the NBA, through its Board of Governors and Commissioner, and/or NBA Properties to contract on their behalf for the live video telecasting of certain regular season and post-season games.  (Complaint ¶ 41.)  Each NBA team has agreed not to compete in the sale of rights for the live video telecasting of regular season games.

00cv1545

(Complaint ¶ 42.)  The NBA Teams have, pursuant to the SBA, jointly agreed to sell the rights to selected regular season games to the NBA to sell to television networks for over-the-air broadcasting.  *Id.*  The NBA Teams have also jointly agreed to sell rights to other selected regular season games to the TNT or TBS stations for national cable broadcasting.  *Id.*  Prior to the 1994-95 season, with the exception of these games, the NBA Teams agreed that, with few specified exceptions, no regular season games could be shown in any geographic market except those licensed by the NBA team in that area.  *Id.*

Beginning in the 1994-95 NBA season, the NBA Defendants agreed to sell jointly their broadcast rights to up to 40 out-of-market regular season NBA games per week and more than 1000 regular season games per year as a package to residential and commercial satellite dish owners.  (Complaint ¶ 44.)  This package is called the "NBA League Pass."  *Id.*  The NBA Defendants have agreed that the NBA League Pass is the exclusive means by which out-of-market games may be licensed for viewing by satellite by individual consumers or commercial establishments.  (Complaint ¶ 45.)  By mutual agreement, individual teams are prohibited from distributing their games outside their assigned geographic territory by any means except the NBA League Pass.  *Id.*  As of November 2, 1999, the fixed subscription price of the NBA League Pass for the following basketball season was $169 for residential use, and $599 to $7499 for commercial use, depending upon fire occupancy code capacity.  *Id.*  The NBA Teams, the NBA, and NBA Properties have contracted with Defendant DirecTV to provide the NBA League Pass to residential and commercial owners of a C-band or Ku-band DSS satellite dish antenna.  (Complaint ¶ 47.)  The NBA Defendants, in contracting with DirecTV, exercise significant control over the market for these games and for the consumer cost of the NBA League Pass.  (Complaint ¶ 48.)  Defendants have agreed to "black out" the re-broadcast of NBA games shown on regional sports networks, except for those games shown within the designated territory of the NBA Teams involved in each particular game.  (Complaint ¶ 49.)

Some NBA consumers, including members of the classes Plaintiffs seek to represent, wish to view the out-of-market games from certain geographic markets but do not wish to purchase the out-of-market games from other geographic markets.  (Complaint ¶ 43.)

1   Plaintiffs allege Defendants sell the NBA League Pass at artificially inflated prices.  (Complaint

2   ¶ 44.)  They further contend that the agreement to restrain the sale of rights to any NBA game

3   outside of the team's assigned geographic territory except through the NBA League Pass is not

4   reasonably necessary to achieve any legitimate business objective.  (Complaint ¶ 50.)  Plaintiffs

5   argue that an exclusive agreement is not necessary to assure the viability of the NBA League

6   Pass but rather serves to artificially raise the price paid, reduce output, and render output

7   unresponsive to consumer demand.  *Id.*  Plaintiffs also maintain that the system of exclusive

8   geographic territories is not necessary to preserve the viability of any individual NBA Team in

9   attracting fans to live games, but only artificially increases prices.  *Id.*  Plaintiffs allege the

10  system of exclusive territories is not necessary to preserve the quality and attractiveness of NBA

11  games by promoting competitive balance among NBA Teams as this concern could be addressed

12  by a system of revenue sharing.  *Id.*

13          Plaintiffs state that for purposes of formulating and effectuating this contract,

14  combination, and conspiracy, Defendants and their co-conspirators have done the following: (1)

15  agreed to divide North America into exclusive geographic territories for the sale of broadcast

16  rights to regular season NBA games; (2) contracted and agreed to restrict the output of the

17  broadcasts of their games in non-exempt channels of distribution; (3) agreed to sell their

18  broadcast rights to purchasers of satellite television programming exclusively through a single,

19  jointly developed product, the NBA League Pass, at prices significantly in excess of those that

20  consumers would pay; and (4) agreed and conspired to distribute these broadcasts to satellite

21  dish owners on an exclusive basis through DirecTV, thereby limiting and restricting competition

22  at the consumer level.  (Complaint ¶ 51.)

23                                **PROCEDURAL BACKGROUND**

24          Plaintiffs Garrett Crayton ("Crayton") and Jill Miller ("Miller") have filed this action on

25  their individual behalf and on behalf of all persons who purchased the NBA League Pass in a

26  jurisdiction subject to the laws of the United States.  (Complaint ¶ 20.)  Crayton and Miller also

27  bring this action on their individual behalf and on behalf of all persons who purchased the NBA

28  League Pass in a jurisdiction subject to the laws of California.  (Complaint ¶ 21.)  Plaintiffs

1  Kingray, Inc. d/b/a The Beer Hunter; Danray, Inc., d/b/a The Beer Hunter; and Bobray

2  Restaurants, Inc. d/b/a The Beer Hunter (collectively referred to as "The Beer Hunters") bring

3  this action on their individual behalf and on behalf of all persons and entities who have

4  purchased the commercial package of the NBA League Pass in a jurisdiction subject to the laws

5  of the United States.  (Complaint ¶ 22.)  The Beer Hunters also bring this action on their

6  individual behalf and on behalf of all persons who purchased the commercial package of the

7  NBA League Pass in a jurisdiction subject to the laws of California.  (Complaint ¶ 23.)

8          Plaintiffs allege that beginning in 1994 and to the present, Defendants have engaged in a

9  continuing contract, combination, and conspiracy that concerned or restrained the trade and/or

10  commerce of satellite broadcasting of NBA professional basketball games through the NBA

11  League Pass in violation of Section 1[1] of the Sherman Act.  Plaintiffs next allege that Defendants

12  offer the reserved basketball games as the "NBA League Pass" exclusively for a fixed and

13  artificially inflated price in violation of Section 2 of the Sherman Act.  Plaintiffs' third cause of

14  action is for violation of California's Cartwright Act.  The fourth cause of action alleges

15  violation of California's Unfair Competition Act.

16          Defendant DirecTV filed the instant motion to dismiss under Federal Rule of Civil

17  Procedure 12(b)(6)[2] or in the alternative, motion to compel arbitration.  While these motions

18  were under submission with the Court, Plaintiffs filed a motion to amend the Complaint.  The

19  Court will first address DirecTV's motions.

## MOTION TO COMPEL ARBITRATION

21  **I.**     **Applicable Law.**

22          The Federal Arbitration Act ("FAA") empowers federal courts to stay actions subject to

23  an arbitration agreement and to order a refusing party to abide by the procedures in the

24  agreement.  9 U.S.C. § 3; *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24-25 (1991).

25  The language of the FAA is mandatory:

26

---

27      [1]  Unless otherwise noted, all future citations to "Section" reference the Sherman Act.

28      [2]  All future citations to "Rule" reference the Federal Rules of Civil Procedure.

00cv1545

1  |  If any suit or proceeding be brought in any of the courts of the United States upon
2  |  an issue referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall
3  |  on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the
4  |  applicant for the stay is not in default in proceeding with such arbitration.

5   9 U.S.C. § 3; *Bosinger v. Phillips Plastics Corp.*, 57 F. Supp. 2d 986, 989 (S.D. Cal. 1999).

6        In determining whether to enforce an arbitration agreement, the Court first looks at

7   whether the parties agreed to arbitrate the dispute. *Mitsubishi Motors Corp. v. Soler Chrysler-*

8   *Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Mediterranean Enters. v. Ssangyong Corp.*, 708 F.2d

9   1458, 1463 (9th Cir. 1983); *Bosinger*, 57 F. Supp. 2d at 989-90; *see Drake Bakeries, Inc. v.*

10  *Local 50, American Bakery & Confectionery Workers Int'l*, 370 U.S. 254, 256 (1962) (holding

11  that whether a dispute should be arbitrated "is to be determined by the contract entered into by

12  the parties"). The Court makes this decision by "applying the 'federal substantive law of

13  arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].'"

14  *Mitsubishi Motors*, 473 U.S. at 626 (*quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

15  *Corp.*, 460 U.S. 1, 14 (1983)); *Bosinger*, 57 F. Supp. 2d at 990. In determining whether the

16  parties agreed to arbitrate a particular issue, courts apply ordinary state law principles governing

17  the formation of contracts. *Bosinger*, 57 F. Supp. 2d at 990. In so doing, the court should not

18  "'except a controversy from coverage of a valid arbitration clause unless it may be said with

19  positive assurance that the arbitration clause is not susceptible of an interpretation that covers

20  the asserted dispute.'" *Id.* (*quoting Marchsese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414,

21  419 (9th Cir. 1984)). The Court should also consider "the strong federal policy favoring

22  enforcement of agreements to arbitrate, resolving any doubts concerning the scope of arbitrable

23  issues in favor of arbitration." *Id.*

24  **II.   Whether the Claims Against DirecTV are Arbitrable.**

25       Direct TV contends that the agreements Plaintiffs entered into with DirecTV when

26  contracting for satellite television service contain broad arbitration clauses that require the

27  claims against DirecTV to be arbitrated. First, the commercial customer agreement that the Beer

28  Hunters Plaintiffs entered into contains the following clause:

6

> Any controversy, claim, dispute or disagreement arising out of, or relating to, this Agreement or any services provided by DIRECTV which cannot be settled by the parties shall be resolved according to binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. then in effect (the "Rules."). . . .

(Adams Decl. Exhs. A-D at ¶ 22.)  Similarly, the residential customer agreement Plaintiffs Crayton and Miller entered into specifies that:

> [I]f we cannot resolve [a legal claim relating to this Agreement, any addendum, or your service] informally, any Claim either of us asserts will be resolved only by binding arbitration.  The arbitration will be conducted under the Commercial Arbitration Rules of the American Arbitration Association that are in effect at the time the arbitration is initiated . . . and under the rules set forth in this Agreement.

(Johnson Decl. ¶ 2; Johnson Decl. Exh. 1 at ¶ 8(b).)  DirecTV contends these broadly-worded clauses mandate that the Plaintiffs' claims against it be submitted to arbitration.

The NBA Defendants and Plaintiffs oppose DirecTV's motion, arguing that the arbitration clauses in the residential and commercial subscription agreements do not cover the claims raised in this action.  Plaintiffs contend that the arbitration clauses are unenforceable because the arbitration agreement is an unfair and unconscionable contract of adhesion and lacks consideration.  The NBA Defendants additionally argue that the Complaint directly implicates the existing contract between NBA and DirecTV, and the NBA's fundamental and longstanding policy relating to the conduct of its television business:  that only the NBA League as a whole and not any individual team, may sell NBA games in the national television market (the "Single Seller Policy").  The NBA Defendants argue they are not a parties to the DirecTV arbitration agreement and because the Single Seller Policy is a critical component of the NBA Defendants' economic health, they are keenly interested in defending the action and are not willing to have the claims arbitrated.

DirecTV correctly argues that the "arising out of and relating to" language in the subscription agreements renders its arbitration clauses broad.  *See Mediterranean Enters.*, 708 F.2d at 1464; *Bosinger*, 57 F. Supp. 2d at 993.  But notwithstanding this broad language and the strong federal policy favoring arbitration of disputes, the Court finds that the claims Plaintiffs have presented are not arbitrable.  At issue in this case is whether DirecTV and the NBA Defendants have conspired and/or contracted to restrain availability of out-of-market NBA

1 | games and have conspired and/or contracted to price those games in an anti-competitive manner
2 | and at an inflated level. This purported conspiracy does not relate to matters within the scope of
3 | the subscription agreements. The commercial subscription agreements cover payment
4 | responsibilities, liability for miscellaneous fees and other charges, DirecTV's right to make
5 | changes in programming packages, collection procedures, service renewals, reservations of
6 | liability, unauthorized use, programming availability, and required equipment. Similarly, the
7 | contract between DirecTV and the individual consumers is a general contract applying to all
8 | DirecTV programming, not a specific contract applicable only to the NBA League Pass. Neither
9 | the commercial nor residential subscription agreements refer to the specific terms of the NBA
10 | League Pass service, nor do they provide that the NBA and/or DirecTV as the exclusive source
11 | of NBA out-of-market games. Further, the subscription agreements are not relevant to the
12 | NBA's Single Seller Policy — a policy that Plaintiffs challenge is part of Defendants'
13 | anticompetitive conduct.

14 |      Moreover, "arbitration is a matter of contract and a party cannot be required to submit to
15 | arbitration any dispute which he has not agreed so to submit." *United Steel Workers v. Warrior*
16 | *& Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). The FAA does not require parties to arbitrate
17 | a dispute when they have not agreed to do so. *Volt Info. Servs., Inc. v. Board of Trustees*, 489
18 | U.S. 468, 478 (1989); *AT&T Techs. Inc. v. Communications Workers of America*, 475 U.S. 643,
19 | 648 (1986); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F. 2d 1136, 1142
20 | (9th Cir. 1991). Thus, because the NBA Defendants have not agreed to arbitrate the instant
21 | dispute, the Court cannot require them to arbitrate the case together with DirecTV and Plaintiffs.
22 | Although the Ninth Circuit finds it permissible to stay those claims that involve issues that will
23 | be resolved by the causes of action sent to arbitration, *see Mediterranean Enters.*, 708 F.2d at
24 | 1464, that option is not available in the instant case given the nature of this action.

25 |      In *Mediterranean Enterprises*, MEI and Ssangyong entered into a preliminary agreement
26 | to form a joint venture. *Id.* at 1461. The parties subsequently entered into an agency agreement
27 | with Trac Enterprises that provided that Trac Enterprises would serve as the agent of the joint
28 | venture in Saudi Arabia. *Id.* The contemplated MEI-Ssangyong joint venture was never actually

1  formed, and MEI sued Ssangyong for breach of contract and breach of fiduciary duty, inducing

2  and conspiracy to induce breach of contract, quantum meruit, and conversion. *Id.* MEI also

3  sued Trac Enterprises. *Id.* at 1460 n.2. The district court sent the breach of contract and breach

4  of fiduciary duty claims to arbitration, and stayed the claims for conspiracy to induce breach of

5  contract, quantum meruit, and conversion. *Id.* at 1460. The Ninth Circuit affirmed the district

6  court's order. *Id.* at 1464-65.

7        In contrast, here, Plaintiffs' claims charge all the Defendants with contracting and

8  conspiring to violate federal and state antitrust laws and California's unfair competition law.

9  Accordingly, there are not separable or distinct claims that would be going to arbitration.

10  Rather, *all* the claims would be going to arbitration with only one of the Defendants —

11  DirecTV. As a result, if this Court were to proceed with the claims as to the NBA Defendants

12  only while DirecTV and Plaintiffs arbitrated the disputes, there is a risk of inconsistent rulings.

13  Further, even if this Court stayed the proceedings as to the NBA Defendants, the arbitrator

14  would make rulings regarding the NBA Defendants' conduct without the NBA Defendants

15  having the opportunity to brief the issues presented or submit evidence. Unless the NBA

16  Defendants are willing to surrender their defense of the case to DirecTV — an unlikely

17  proposition given the importance of the Single Seller Policy — the NBA Defendants would be

18  effectively forced to join the arbitration to defend against the claims asserted. Such a result is

19  contrary to the above-cited authority prohibiting courts from requiring parties to submit to

20  arbitration where they have not agreed to do so. In brief, because the dispute involves a

21  purported conspiracy among the Defendants, it is necessary to have all the Defendants in one

22  proceeding to fully and fairly adjudicate the claims.

23        For the foregoing reasons, DirecTV's motion to compel arbitration is **DENIED**. In light

24  of the its ruling that the claims are not arbitrable, the Court declines to consider Plaintiffs'

25  argument that the arbitration agreement is unfair and unconscionable.

26  ///

27  ///

28  ///

00cv1545

## MOTION TO DISMISS

I.    **Applicable Law**.

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe them the light most favorable to the nonmoving party. *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).  However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *see Pareto*, 139 F.3d at 699 ("conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss").  A court reviewing a motion to dismiss may consider the facts alleged in the complaint, documents attached to the complaint, and matters of which the Court takes judicial notice. *See Hal Roach Studios, Inc. v. Richard Fiener & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

The Court may dismiss a complaint as a matter of law either for lack of a cognizable legal theory or for the absence of sufficient facts alleged under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  Under Rule 12(b)(6), a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff could prove no set of facts in support of his or her claim for relief. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

II.   **The Sherman Act Claims**.

In analyzing the sufficiency of the Complaint's antitrust allegations, the Court is mindful that generally, "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators." *Double D Spotting Serv., Inc. v . Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).  Nevertheless, the essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to defeat a motion to dismiss. *Id.* at 558.  If the alleged facts "do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." *Rutman*

00cv1545

1  *Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) (internal quotations

2  omitted).  "A plaintiff must allege sufficient facts to support a cause of action under the antitrust

3  laws.  Conclusory allegations that the defendant violated those laws are insufficient." *TV*

4  *Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th

5  Cir. 1992).

6  **A.     Sherman Act Section 1 Claim.**

7  Section 1 "prohibits conspiracies and agreements that unreasonably restrain trade."

8  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989); 15 U.S.C.

9  § 1.  "A section 1 plaintiff must prove an agreement between two or more persons to restrain

10  trade, because unilateral conduct is not illegal under section 1." *Levine v. Central Florida Med.*

11  *Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996).  But not every agreement that restrains

12  competition violates the Sherman Act; rather, to be unlawful, the agreement must *unreasonably*

13  restrain competition. *McDaniel v. Appraisal Inst.*, 117 F.3d 421, 422 (9th Cir. 1997); *Thurman*

14  *Indus.*, 875 F.2d at 1373; *Levine*, 72 F.3d at 1545.  The unreasonableness of the agreement is

15  analyzed under either a *per se* rule of illegality or a rule of reason analysis. *McDaniel*, 117 F.3d

16  at 422; *Thurman Indus.*, 875 F.2d at 1373.   The *per se* rule applies only where the practice at

17  issue "'facially appears to be one that would always or almost always tend to restrict

18  competition and decrease output.'" *D.A. Rickards, M.A. v. Canine Eye Registration Fndn.*, 783

19  F.2d 1329, 1332 (9th Cir. 1986) (*quoting National Collegiate Athletic Ass'n v. Board of Regents*

20  *of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984)); *Nova Designs, Inc. v. Scuba Retailers Ass'n*,

21  202 F.3d 1088, 1091 (9th Cir. 2000).  "*Per se* violations are 'naked restraints of trade with no

22  purpose except stifling of competition,' and have been characterized as so 'plainly anti-

23  competitive' and lacking 'any redeeming virtue' that they are presumed illegal under § 1.'"

24  *United States v. Andreas*, 216 F.3d 645, 666 (7th Cir. 2000) (internal citation omitted); *see*

25  *National Collegiate*, 468 U.S. at 100 (holding that a practice that facially appears to restrict

26  competition "is presumed unreasonable without inquiry into the particular market context in

27  which it is found.").  Some practices, such as horizontal price-fixing, are subject to a *per se*

28  analysis. *National Collegiate*, 468 U.S. at 101 & n.21.

1    Agreements that are not presumed unreasonable under the *per se* category are analyzed

2    under the "rule of reason" test. *Levine*, 72 F.3d at 1546. Under a rule of reason analysis, the

3    plaintiff must show: "'(1) an agreement or conspiracy among two or more persons or distinct

4    business entities; (2) by which the persons or entities intend to harm or restrain competition; and

5    (3) which actually restrains competition.'" *Thurman Indus.*, 875 F.2d at 1373 (*quoting Oltz v. St.*

6    *Peter's Community Hosp.*, 861 F.2d 1440, 1445 (9th Cir. 1988)); *Austin v. McNamara*, 979 F.2d

7    728, 738 (9th Cir. 1992). "An essential element of a Section 1 violation under the rule of reason

8    is injury to competition in the relevant market." *Alliance Shippers, Inc. v. Southern Pac.*

9    *Transp. Co.*, 858 F.2d 567, 570 (9th Cir. 1988). Thus, the antitrust violation must harm

10   competition, not just competitors. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811-12 (9th

11   Cir. 1988).

12          1.      **Price Fixing Theory**.

13          In opposition, Plaintiffs state that their Section 1 claim consists of Defendants engaging

14   in a horizontal price fixing conspiracy, and argue that the *per se* rule applies. The *per se* rule is

15   reserved for agreements or practices that have a pernicious effect on competition and lack any

16   redeeming value, and therefore are presumed to be unreasonable and illegal. *Austin*, 979 F.2d at

17   738. Plaintiffs state the Complaint properly alleges that DirecTV participated in a conspiracy to

18   fix prices.

19          DirecTV responds that the Complaint does not in fact allege that DirecTV participated in

20   a price fixing scheme. Rather, the Complaint alleges that the NBA Defendants conspired to set

21   the prices and restrict the output of the broadcasts. Having carefully reviewed the Complaint,

22   the Court finds that this pleading is somewhat unclear as to DirecTV's role in the alleged price

23   fixing scheme. Paragraph 57 of the Complaint is an example of this ambiguity. Some of its

24   allegations suggest that all Defendants were involved in the conspiracy, stating that "[f]or the

25   purpose of formulating and effectuating this contract, combination, and conspiracy, Defendants

26   and their co-conspirators have done, among other things . . ." (Complaint ¶ 57.) But in listing

27   the allegedly illicit activities, the paragraph singles out the NBA Defendants, stating "(a)

28   Defendants NBA, NBA Properties, Inc., and each of the NBA Teams contracted and agreed to

1   set the prices at which the NBA, and the NBA Teams, would sell their broadcast rights through

2   'NBA League Pass' . . . ."  (Complaint ¶ 57.)  Other paragraphs in the Complaint also suggest

3   that *only* the NBA Defendants were involved in the price fixing scheme.  For example,

4   paragraph 45 reads:

5   > The NBA Teams, the NBA, and NBA Properties, Inc. have agreed that "NBA
5   > League Pass" is the exclusive means by which out-of-market games may be
6   > licensed for viewing by satellite by individual consumers or commercial
6   > establishments.  Individual teams are prohibited, by mutual agreement, from
7   > distributing their games outside their assigned geographic territory by any means
7   > except the "NBA League Pass," for which consumers must pay a fixed
8   > subscription price for the entire package.  As of November 2, 1999, the fixed
8   > subscription price of the "NBA League Pass" for the following basketball season
9   > was as follows:  (1) residential use — $169; (2) commercial use — $599 - $7499
9   > depending upon fire occupancy code capacity.

10

11  (Complaint ¶ 45.)

12          Other allegations, however, state that "Defendants" conspired to fix prices, suggesting

13  that DirecTV was also involved.  For example, in paragraph 46 Plaintiffs allege that "[t]he

14  substantial terms of the continuing agreement and conspiracy among the Defendants were to fix,

15  raise, stabilize, and maintain prices for the rights to, and restrict the output of, video broadcasts

16  of NBA games."  (Complaint ¶ 46.)  Similarly, in paragraph 56, the Complaint alleges that the

17  "contract, combination, and conspiracy consisted of a continuing agreement and conspiracy

18  among Defendants and their co-conspirators, the substantial terms of which were to fix, raise,

19  stabilize, and maintain prices for the rights to, and restrict the output of, live video broadcasts of

20  NBA professional basketball games through non-exempt channels of distribution."  (Complaint ¶

21  56.)  In addition, in paragraph 1, Plaintiffs allege "Defendant basketball league, Defendants

22  professional basketball teams, Defendant pay television provider, and others have conspired to

23  sell the "NBA League Pass," an exclusive sports package . . . to consumers for a fixed fee . . . ."

24  (Complaint ¶ 1.)

25          Analyzing the Complaint as alleging a price fixing scheme, the Court agrees with

26  DirecTV that a claim for horizontal price fixing fails.  Horizontal price fixing occurs when

27  competitors agree to set prices and thereby interfere with free market forces.  *See Business*

28  *Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by

1    agreement between competitors have traditionally been denominated as horizontal restraints, and

2    those imposed by agreement between firms at different levels of distribution as vertical

3    restraints."). The NBA Defendants govern and participate in a professional basketball league.

4    (Complaint ¶¶ 39-40.) DirecTV is in the business of operating satellites that broadcast media

5    directly to DirecTV subscribers. (Complaint ¶ 47.) Therefore, the NBA Defendants and

6    DirecTV are not actual or potential competitors and cannot engage in horizontal price fixing.

7        In their opposition, Plaintiffs allude to the possibility that DirecTV and the NBA

8    Defendants are engaged in a vertical price fixing scheme. As an initial matter, the Court notes

9    the Complaint does not specifically state that DirecTV and the NBA Defendants have entered

10    into a vertical price fixing conspiracy. But construing the Complaint in the light most favorable

11    to the Plaintiffs, the court will analyze the sufficiency of the Section 1 cause of action as vertical

12    price fixing claim.

13        Vertical price fixing occurs when a supplier attempts to fix the prices charged by those

14    who resell its products. *General Cinema Corp. v. Buena Vista Distrib. Co.*, 681 F.2d 594, 597

15    (9th Cir. 1982); *see Business Electronics Corp.*, 485 U.S. at 730 ("Restraints imposed by

16    agreement between competitors have traditionally been denominated as horizontal restraints, and

17    those imposed by agreement between firms at different levels of distribution as vertical

18    restraints."). A vertical price fixing scheme setting minimum prices is generally subject to *per*

19    *se* analysis. *Business Electronics Corp.*, 485 U.S. at 725-27; *Electronics Communications Corp.*

20    *v. Toshiba America Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997); 1 Julian O. von

21    Kalinowski *et al., Antitrust Laws and Trade Regulation* § 18.02[2] at 18-5 (2d ed. 2000).[3]

22        DirecTV contends that Plaintiffs cannot state a claim for vertical price fixing because a

23    manufacturer has the right to deal or refuse to deal with whomever it likes, and can announce its

24    resale price and refuse to deal with those who fail to comply without running afoul of the

25    antitrust laws. In support, DirecTV cites *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752

26

27        [3] Vertical agreements fixing maximum resale prices, and vertical restraints not involving price fixing are generally analyzed under the rule of reason test. *Electronics Communications*,

28    129 F.3d at 243; 1 Julian O. von Kalinowski *et al., Antitrust Laws and Trade Regulation* § 18.02[3] at 18-9 (2d ed. 2000).

1   (1984), *United States v. General Elec. Co.*, 272 U.S. 476 (1926), and *LucasArts Entm't Co. v.*

2   *Humongous Entm't Co.*, 870 F. Supp. 285 (N.D. Cal. 1993).

3       In *Monsanto*, a terminated distributor of agricultural herbicides brought an antitrust suit

4   against the manufacturer alleging that the manufacturer conspired with other distributors to fix

5   resale prices and that the manufacturer had terminated the plaintiff's distributorship in

6   furtherance of a conspiracy. *Monsanto*, 465 U.S. at 755-57. A jury awarded $3.5 million in

7   damages to the distributor that was trebled to $10.5 million. *Id.* at 758. The Seventh Circuit

8   affirmed, finding that the evidence showing plaintiff's distributorship was terminated following

9   competitor complaints was sufficient to satisfy the plaintiff's burden of proving a conspiracy to

10  set resale prices. *Id.* at 758-59. The United States Supreme Court held that the Seventh Circuit

11  had applied an erroneous evidentiary standard and that "something more than evidence of

12  complaints [was] needed." *Id.* at 764. Rather, the Court held that there needed to be evidence

13  that "tend[ed] to exclude the possibility that the manufacturer and nonterminated distributors

14  were acting independently." *Id.* In so holding, the Court noted a basic distinction between

15  concerted and independent action for purposes of Section 1, and that "[i]ndependent action is

16  not proscribed." *Id.* at 761. Therefore, "[a] manufacturer of course has a right to deal, or refuse

17  to deal, with whomever it likes, as long as it does so independently" and can also "announce its

18  resale prices in advance and refuse to deal with those who fail to comply." *Id.*

19      In *General Electric*, the Supreme Court held that a patentee that manufactures and sells

20  its patented product can, without running afoul of antitrust laws, dictate the price its licensee

21  sells that product. *General Elec.*, 272 U.S. at 490. The Northern District of California has

22  applied *General Electric* to copyright cases, allowing the owner of a copyright to set the prices

23  the licensees sell the copyrighted product if such control is reasonably related to protecting the

24  legitimate interests of the copyright owner. *LucasArts Entm't*, 870 F. Supp. at 289-90. But for

25  *General Electric* and *LucasArts* to apply, "the price must be established and enforced by the

26  copyright licensor alone and not be the result of an agreement among various licensors, or

27  between licensor and licensees. If the price fixing stems from such an 'agreement,' a per se

28  ///

15

00cv1545

1   unlawful combination or conspiracy in violation of the Sherman Act may result." 1 Julian O.

2   von Kalinowski *et al.*, *Antitrust Laws and Trade Regulation* § 18.05[2] at 18-46 (2d ed. 2000).

3          Under this case law, for this Court to concur with DirecTV's argument, it would have to

4   presume that *only* the NBA Defendants were involved in establishing the price of the NBA

5   League Pass. The Court declines to do so at this time. As discussed above, the allegations are

6   somewhat ambiguous regarding DirecTV's role in setting the price for this product.

7   Accordingly, although the Complaint presently fails to state a claim for vertical price fixing, the

8   Court will grant Plaintiff leave to amend the Complaint to add factual allegations clarifying

9   DirecTV's role in an alleged vertical price fixing scheme.

10         **2.    Other Section 1 Theories**.

11         Although Plaintiffs' opposition emphasizes their price fixing theory, both the Complaint

12  and the parties' briefs also reveal two other purported antitrust violations. First, Plaintiffs argue

13  that DirecTV was involved in a contract, combination, or conspiracy to restrict output of the

14  video broadcasts. Plaintiffs' opposition, however, mentions these allegations as part of its

15  argument that DirecTV was involved in a price fixing scheme and does not separately address

16  the sufficiency of the allegations regarding restricting output. DirecTV also did not specifically

17  address the merits of a restricting output theory.

18         Generally, output limitations are treated under the *per se* rule. *Andreas*, 216 F.3d at 668;

19  *Levine*, 72 F.3d at 1545. There are some circumstances, however, where horizontal agreements

20  on production could be pro-competitive and analyzed under the rule of reason test. *Andreas*,

21  216 F.3d at 668. The Complaint's allegations regarding restricting outputs were presented

22  together with those regarding price fixing. Regardless of whether the *per se* or rule of reason

23  analysis applies, the Court finds the Complaint's allegations are unclear — just as the price

24  fixing allegations are — regarding DirecTV's role in the alleged conspiracy. Accordingly, the

25  Court will grant Plaintiffs leave to amend the Complaint to allege a theory of antitrust law

26  violations by restricting outputs.

27         The second theory that both parties allude to is Plaintiffs' theory that the exclusive

28  distributorship agreement between the NBA Defendants and DirecTV is prohibited by antitrust

1    laws. DirecTV correctly argues that there is nothing illegal about an exclusive distributorship

2    absent an intent to harm competition. *See Rutman*, 829 F.2d at 735 (noting that "an agreement

3    between a manufacturer and a distributor to establish an exclusive distributorship is not,

4    standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect

5    competition in the market"). To state an antitrust violation based upon an exclusive

6    distributorship, the Ninth Circuit requires an allegation of specific intent to harm competition as

7    well as allegations of anticompetitive conduct from which such specific intent may be inferred.

8    *Rutman*, 829 F.2d at 735. Indeed, a case that Plaintiffs rely upon, *Electronics Communications*,

9    also states that for an exclusive distributorship to violate Section 1, it must have an actual

10   adverse effect on competition in the relevant market. *Electronics Communications*, 129 F.3d at

11   243-46.

12       The Court agrees with DirecTV that the Complaint fails to properly allege an intent to

13   harm competition or any specific harm to competition in the relevant market. The only

14   allegation is that the NBA Defendants "[a]greed and conspired to distribute these broadcasts to

15   satellite dish owners on an exclusive basis through DirecTV thereby limiting and restricting

16   competition at the consumer level." (Complaint ¶ 51.) This allegation is a bare legal conclusion

17   and therefore insufficient to withstand a motion to dismiss. *See Rutman*, 829 F.2d at 736 (noting

18   that if the plaintiffs "do not at least outline or adumbrate a violation of the Sherman Act, the

19   plaintiffs will get nowhere merely by dressing them up in the language of antitrust") (internal

20   quotations omitted). Insofar as Plaintiffs contend that the alleged price fixing scheme supports

21   the conclusion that the exclusive distributorship agreement violates Section 1, as discussed

22   above, Plaintiffs have not adequately alleged DirecTV's role in the purported price fixing

23   scheme. Therefore, because Plaintiffs have not alleged any facts demonstrating an intent to

24   harm competition or antitrust injury (*i.e.*, harm to competition), insofar as Plaintiffs seek to

25   allege a Section 1 violation based on the NBA Defendants and DirecTV's exclusive

26   distributorship agreement for the NBA League Pass, those allegations fail to state a claim.

27       The Court further notes that Plaintiffs' citation to *Tampa Elec. Co. v. Nashville Coal Co.*,

28   365 U.S. 320 (1961) does not salvage Plaintiffs' claim. *Tampa Elec.* concerned an exclusive

1 | dealing arrangement.[4]  An exclusive dealing agreement is a commitment by a buyer to deal with

2 | only a particular seller for an extended period of time.  1 Julian O. von Kalinowski *et al.*,

3 | *Antitrust Laws and Trade Regulation* § 23.01[1] at 23-2 (2d ed. 2000).  There are no allegations

4 | in the Complaint indicating that the relationship between the NBA Defendants and DirecTV

5 | constitutes exclusive dealing.  Specifically, there are no allegations that DirecTV has contracted

6 | to obtain all of its programming from the NBA, or that the NBA has contract to provide all of its

7 | broadcasts to DirecTV.  Rather, the Complaint only alleges that DirecTV is the exclusive

8 | *distributor* of the NBA League Pass.  Accordingly, Plaintiff's reliance on this exclusive dealing

9 | cases fails.

10 | ### 3.   Agent-Immunity Rule.

11 | DirecTV argues that even if Plaintiffs had properly alleged a conspiracy, those allegations

12 | are insufficient under the "agent-immunity rule" because Plaintiffs have alleged that DirecTV

13 | acted as the NBA Defendants' agent.  DirecTV states that because Plaintiffs allege that DirecTV

14 | acted as the agent of the NBA Defendants for purposes of selling the NBA League Pass,

15 | DirecTV was legally incapable of conspiring with the NBA and its teams.  Plaintiffs respond

16 | that there is no blanket "agent-immunity rule" in federal antitrust law.   Plaintiffs further contend

17 | that an agent or subsidiary may be held liable under the antitrust laws, even if it would otherwise

18 | qualify for Section 1 immunity, if the agent has a personal stake in the conspiracy.

19 | ///

20 |

21 | [4]  Plaintiffs also cite *Hershey Chocolate Corp. v. FTC*, 121 F.2d 968 (3d Cir. 1941).  That
22 | Third Circuit case, however, concerned a petition requesting review of an order by the Federal
Trade Commission ("FTC").  In that case, the FTC found that two chocolate manufacturers had,
23 | by contract, limited the sale of chocolate bars in a size suitable for vending machines to the three
largest operators of vending machines.  *Hershey Chocolate*, 121 F.3d at 970.  The FTC found
24 | that the agreement's effect unfairly injured competitors of the vending machine operators and to
some extent deprived the public of certain chocolate bars.  *Id.*  The FTC further found that this
25 | exclusive distributorship and an understanding that succeeded it unduly restricted competition
and tended to create a monopoly.  *Id.*  After considering the FTC's findings and the parties'
26 | arguments, the Third Circuit affirmed the FTC's order.  *Id.* at 970-72.
While *Hershey Chocolate* indicates that exclusive distributorships may violate antitrust
27 | laws, as discussed above, the Court finds that the Complaint fails to properly allege *how* the
challenged exclusive distributorship in this action restrains trade.  Further, the Third Circuit in
28 | *Hershey Chocolate* had the benefit of the FTC's evidentiary findings, making *Hershey
Chocolate* distinguishable from this case on procedural grounds.

1   DirecTV cites *Applied Equip. Corp. v .Litton Saudi Arabia, Ltd.*, 7 Cal. 4th 503 (1994) in

2   support of its proposition that an agent is legally incapable of conspiring with its principal.

3   *Applied Equipment* concerned the California tort of intentional interference with performance of

4   a contract, and held that a party to a contract cannot conspire to tortiously interfere with the

5   contract. *See Applied Equip.*, 7 Cal. 4th at 510-14.  Significantly, *Applied Equipment* did not

6   address antitrust violations under the Sherman Act or California's Cartwright Act.  Accordingly,

7   the Court finds *Applied Equipment* to be inapposite to this case.

8   In its reply, DirecTV cites *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752

9   (1984) in support.  In *Copperweld,* the United States Supreme Court held that only separate

10   entities pursuing separate economic interests can conspire within the proscription of the antitrust

11   laws against price-fixing combinations. *Copperweld*, 467 U.S. at 769-71; *City of Mt. Pleasant,*

12   *Iowa v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 274-75 (8th Cir. 1988).  A conglomeration

13   of two or more legally distinct entities cannot conspire among themselves where they pursue the

14   common interests of the whole rather than those separate of the group itself. *Copperweld*, 467

15   U.S. at 769-71; *City of Mt. Pleasant*, 838 F.2d at 274-75.  The form of organization, corporate or

16   otherwise, does not control the question of whether there was joint conduct cognizable under the

17   Sherman Act, but rather the economic reality should control the decision. *Copperweld*, 467 U.S.

18   at 769-71; *City of Mt. Pleasant*, 838 F.2d at 275.

19   Having reviewed the applicable law, the Court finds that it is possible that *Copperweld*

20   applies to this case, but it is not appropriate at this stage of the pleadings for the Court to make

21   this determination.  In *Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir. 1993),

22   another case DirecTV relies upon, the Ninth Circuit noted that "[w]hether corporate entities are

23   sufficiently independent requires an examination of the particular facts of each case." *Williams*,

24   999 F.2d at 447.  Other Ninth Circuit cases have also held that the nature of an entity and its

25   ability to combine or conspire in violation of Section 1 is a fact question. *Los Angeles Memorial*

26   *Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1387 (9th Cir. 1984); *Las Vegas*

27   *Sun, Inc. v. Summa Corp.*, 610 F. 2d 614, 617 (9th Cir. 1979).  Here, Plaintiffs have alleged that

28   DirecTV is an entity separate from the NBA Defendants with independent interests of its own.

19

1  (Complaint ¶ 18.)  In light of the fact-specific nature of the Defendants' abilities to conspire, the

2  Court finds these allegations are sufficient to withstand a motion to dismiss.  Accordingly,

3  DirecTV's motion to dismiss the Section 1 claim on the grounds of the agent-immunity rule is

4  **DENIED**.

5         **4.        Conclusion**.

6         DirecTV's motion to dismiss the first cause of action for violation of Section 1 of the

7  Sherman Act is **GRANTED in part and DENIED in part**.  The Court, however, will allow

8  Plaintiffs an opportunity to amend the Complaint to add factual allegations to support its theory

9  that DirecTV was involved in a vertical price fixing scheme, that DirecTV was involved in a

10  conspiracy to restrict outputs, and that the DirecTV's exclusive distributorship violates antitrust

11  law.

12     **B.     Sherman Act Section 2 Claim**.

13         To succeed on their claim for actual monopolization under Section 2, Plaintiffs must

14  prove Defendants: "(i) possessed monopoly power in the relevant markets; (ii) willfully acquired

15  or maintained its monopoly power through exclusionary conduct; and (iii) caused antitrust

16  injury." *American Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l*

17  *Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997); *Smilecare Dental Group v. Delta Dental*

18  *Plan of California*, 88 F.3d 780, 783 (9th Cir. 1996).  Monopoly power is "the power to control

19  prices or exclude competition." *American Prof'l*, 108 F.3d at 1154 (*quoting United States v.*

20  *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)); *United States v. Grinnell Corp.*, 384

21  U.S. 563, 571 (1966).  The Sherman Act does not prohibit every monopoly, but rather renders

22  unlawful only those monopolies attained or perpetuated by predatory practices.  *Alaska Airlines,*

23  *Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547-48 (9th Cir. 1991); *Williams v. I.B. Fischer*, 794

24  F. Supp. 1026, 1034 (D. Nev. 1992), *aff'd*, 999 F.2d 445 (9th Cir. 1993).  Thus, antitrust laws

25  tolerate efficient monopolies and natural monopolies, *Alaska Airlines*, 948 F.2d at 548, and

26  "there is nothing inherently anti-competitive about having a monopoly over the supply of one's

27  own products." *Williams*, 794 F. Supp. at 1034.

28  ///

1    DirecTV argues that Plaintiffs fail to adequately allege a conspiracy between DirecTV

2  and the NBA Defendants, and have failed to allege sufficient facts indicating that DirecTV or

3  any of the Defendants willfully acquired or maintained any monopoly power.  Having reviewed

4  the Complaint, the Court agrees with DirecTV that the Complaint's allegations are deficient.

5  The Complaint only contains the conclusory assertion that "Defendants and their co-

6  conspirators, by the above-mentioned conduct, possess monopoly power over the reserved

7  basketball games and have used that power for the purposes of unreasonably excluding and/or

8  limiting competition." (Complaint ¶ 65.)   The Complaint fails to allege facts regarding the

9  market power held by Defendants generally, or DirecTV in particular.  The Complaint also does

10  not allege facts indicating Defendants willfully obtained monopoly power in the relevant market

11  through exclusionary conduct.  The Complaint also does not allege facts indicating that new

12  rivals are barred from entering the market or that existing competitors lack the capacity to

13  expand their output to challenge Defendants' product.

14    Further, as discussed regarding the Section 1 claim, the Complaint's allegations of

15  anticompetitive conduct are insufficient to withstand a motion to dismiss.  Plaintiffs have failed

16  to allege facts indicating that an injury to the market or to competition in general has occurred,

17  or that DirecTV was involved in price fixing.  For this alternative reason, Plaintiffs' Section 2

18  claim must be dismissed.  *See Williams*, 999 F.2d at 448 (conduct that is not anticompetitive

19  under Section 1 "cannot form the basis of a Section 2 claim"); *Rutman*, 829 F.2d at 736

20  (dismissing Section 2 claim on the alternative ground that the allegations regarding specific

21  intent and anticompetitive conduct were insufficient to allege a claim under Section 1).

22    Plaintiffs' opposition does not respond to DirecTV's arguments, and this silence can be

23  construed as consent to the granting of the motion on this ground.  *See* Civ. L. R. 7.1(f)(3)(c).

24  Accordingly, DirecTV's motion to dismiss Plaintiff's Section 2 claim is **GRANTED** and that

25  cause of action is **DISMISSED WITH PREJUDICE** as to all Defendants.

26  **III.   Cartwright Act Claim.**

27    DirecTV argues that Plaintiffs' Cartwright Act claim fails for the same reasons their

28  Sherman Act claims fail, and also because state antitrust regulation is inapplicable to

00cv1545

1  professional sports as violative of the Commerce Clause.  As an initial matter, insofar as

2  Plaintiff's Cartwright Act relies upon Plaintiffs' monopolization claim that the Court has

3  dismissed with prejudice, the Cartwright Act cause of action fails and it is unnecessary for this

4  Court to address DirecTV's Commerce Clause argument as to that issue.  *See Nova Designs*, 202

5  F.3d at 1092.

6        Because this Court has granted Plaintiffs leave to amend their first cause of action for

7  violation of Section 1, the Court finds it necessary to consider DirecTV's Commerce Clause

8  argument.  In support of its position that Plaintiffs' Cartwright Act claim violates the Commerce

9  Clause, DirecTV cites *Flood v. Kuhn*, 407 U.S. 258, 284-85 (1972) and *Partee v. San Diego*

10  *Chargers Football Co.*, 34 Cal. 3d 378 (1983).  Plaintiffs respond that DirecTV is not a

11  professional sports team, and therefore it can be liable under the Cartwright Act.  Plaintiffs

12  further contend that even if DirecTV were subject to sports team immunity, it could not do so in

13  this case because *Partee* is distinguishable from this case as Plaintiffs' Cartwright Act

14  allegations concern only satellite broadcasts sold to California residents.

15        Having reviewed the relevant case law, the Court finds that DirecTV has not met its

16  burden in showing that Plaintiffs' Cartwright Act claim is precluded.  DirecTV contends that

17  claim is precluded *per se* because state antitrust regulation does not apply to professional sports

18  teams, such as the NBA.  But *Flood* and *Partee* conducted extensive consideration of the nature

19  of the plaintiffs' claims, the burdens that state antitrust regulation would have on the league's

20  interstate commerce activities, and the interests of the state in applying the antitrust statutes.

21  These cases demonstrate the need for extensive analysis in determining whether the Commerce

22  Clause prohibits state antitrust regulation of an activity.

23        In *Flood*, a professional baseball player raised statutory and common law challenges to

24  baseball's reserve system.  The district court denied the state law claims, finding that baseball's

25  unique exemption from federal antitrust law mandated a similar exemption from state antitrust

26  regulation.  *Flood v. Kuhn*, 316 F. Supp. 271, 279-80 (S.D.N.Y. 1970).  The Court of Appeals

27  affirmed, but on the grounds that state antitrust regulation would be an impermissible burden on

28  ///

1  interstate commerce. *Flood v. Kuhn*, 443 F.2d 264, 268 (2d Cir. 1971). The United States

2  Supreme Court affirmed. *Flood*, 407 U.S. at 284-85.

3      In *Partee*, a professional football player who played for the San Diego Chargers Football

4  Company, a member of the National Football League, sued the team for damages alleging that

5  the NFL's operating rules violated the Cartwright Act. The California Supreme Court found that

6  the Cartwright Act could not be applied to the player-team-league relationships challenged by

7  the plaintiff without impermissibly burdening interstate commerce. *Partee*, 34 Cal. 3d at 384-

8  85. In so holding, *Partee* stated that:

9      Professional football's teams are dependent upon the league playing schedule for
   competitive play . . . . The necessity of a nationwide league structure for the

10  benefit of both teams and players for effective competition is evident as is the need
   for a nationally uniform set of rules governing the league structure. Fragmentation

11  of the league structure on the basis of state lines would adversely affect the
   success of the competitive business enterprise, and differing state antitrust

12  decisions if applied to the enterprise would likely compel all member teams to
   comply with the laws of the strictest state.

13

14  *Partee* 34 Cal. 3d at 384-85. *Partee* cited a Southern District of New York case that applied

15  *Flood* to hold that state antitrust laws did not apply to the NBA's rules regarding player

16  contracts and the college draft, *Robertson v. National Basketball Ass'n.*, 389 F. Supp. 867, 881

17  (S.D.N.Y. 1975). *Partee*, 34 Cal. 3d at 384.

18      Significantly, *Partee* and *Flood* involved challenges to rules that governed the

19  relationship between the players, teams, and sports leagues. DirecTV has not cited any case that

20  applies *Flood* or *Partee* to the broadcasting of games. To be sure, broadcasting of the NBA

21  League Pass is done on a nationwide basis, but DirecTV has not presented any analysis

22  suggesting that the burden imposed on interstate commerce by state regulation of the NBA

23  League Pass is similar to the impermissible burdens imposed by state regulation of the player-

24  team-league relationships. *Partee* indicates that a extensive analysis is required to determine

25  whether a Commerce Clause defense will be successful against a claim under the Cartwright

26  Act. Accordingly, the Court finds that DirecTV has not met its burden in showing that the

27  Cartwright claim is precluded. DirecTV's motion to dismiss this cause of action *is therefore*

28  **DENIED**.

00cv1545

**IV.    The Unfair Competition Claim Under Business & Professions Code Section 17200**.

DirecTV argues that Plaintiffs' claim under California's Unfair Competition Act fails because it is predicated solely upon the assumption that Defendants' conduct violates the Sherman and Cartwright Acts.  To state a *prima facie* case for unfair competition in violation of section 17200, a plaintiff must allege that the conduct in question is either "unlawful, unfair, or fraudulent." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999); *Wilner v. Sunset Life Ins. Co.*, 78 Cal. App. 4th 952, 964 (2000).  Thus, a practice is prohibited as "unfair" or "deceptive" even though it may not be "unlawful," and vice versa. *Cel-Tech*, 20 Cal. 4th at 180; *Wilner*, 78 Cal. App. 4th at 965.  Whether a business practice is unfair depends upon an examination of the practice's impact on its victim, balanced against the reasons, justifications, and motives of the alleged wrongdoer. *Wilner*, 78 Cal. App. 4th at 965.  Stated another way, a business practice is "unfair" if it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." *Id.* (internal quotations omitted).

The Complaint's allegations in support for this cause of action are that DirecTV engaged in a conspiracy to restrain trade and/or form a monopoly.  (Complaint ¶ 75.)  DirecTV argues that Plaintiffs have failed to allege that DirecTV has done anything other than distribute the NBA League Pass.  DirecTV contends that because Plaintiffs' allegations of unfair competition by DirecTV are based on Plaintiffs' Sherman Act and Cartwright Act claims, Plaintiffs cannot maintain their claim for unfair competition.

Plaintiffs respond that their price fixing claim is an unlawful business practice under the Business and Professions Code.  Plaintiffs also argue they do not base their unfair competition claim solely upon DirecTV's violations of the Sherman and Cartwright Acts.  They also allege that DirecTV's conduct is likely to deceive the People of the State of California and the general public and that, therefore, DirecTV has engaged in a fraudulent business practice in violation of Business and Professions Code section 17200.  Plaintiffs state they have alleged that the Defendants have conspired and/or contracted to restrain availability of out-of-market NBA games, and have conspired and/or contracted to price those games in an anti-competitive manner

1  and at an inflated level.  According to Plaintiffs, these allegations are sufficient to allege a cause

2  of action for unfair competition.

3        After reviewing the Complaint, it is not clear that Plaintiffs are relying on any factual

4  allegations or wrongful conduct other than that alleged in support of their antitrust claims.

5  Although Plaintiffs state they have additional allegations, these allegations are legal conclusions

6  regarding the effect of the Defendants' purportedly wrongful activities.  There are no factual

7  allegations regarding the Defendants' activities that are separate from those alleged in support of

8  the antitrust claims.  Accordingly, the Plaintiffs' unfair competition claim is dependent upon

9  their antitrust claims.  Insofar as Plaintiffs support their unfair competition claim on their

10  allegations of monopolization, as discussed above, the Complaint fails to state a claim under

11  Section 2 of the Sherman Act because it does not allege any facts to support a monopolization

12  claim.  To the extent Plaintiffs' rely on their restraint of trade allegations, for the reasons

13  discussed above, the Court finds that the Complaint is unclear as to DirecTV's role in price

14  fixing and restricting outputs.  The Court also has found that Plaintiffs have failed to properly

15  allege intent to harm competition and harm to competition in support of their claim that

16  DirecTV's role in restricting outputs and exclusive distributorship violates antitrust law.  In

17  brief, the Court has found Plaintiffs' Section 1 allegations deficient.  Cast as violations of

18  California's unfair competition law, they fare no better.  *See Kentmaster Mfg. Co. v. Jarvis*

19  *Prods. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998), *amended by* 164 F.3d 1243 (9th Cir. 1999)

20  (holding that the claim for unfair competition, which depended on allegations for predatory

21  pricing previously found deficient, failed for the same reasons the federal claims failed).

22  Accordingly, DirecTV's motion to dismiss Plaintiff's unfair competition claim is **GRANTED**

23  and this cause of action is **DISMISSED WITH LEAVE TO AMEND.**

24                                   **MOTION TO AMEND**

25  **I.    Standard for Leave to Amend a Complaint.**

26        Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint after a

27  responsive pleading has been filed may be allowed by leave of the Court and such leave "shall

28  be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Granting leave to amend rests

1 in the sound discretion of the trial court. *International Ass'n of Machinists & Aerospace*

2 *Workers v. Republic Airlines*, 761 F.2d 1386, 1390 (9th Cir. 1985). Courts must exercise this

3 discretion with consideration to the strong federal policy favoring the disposition of cases on the

4 merits and permitting amendments with "extreme liberality." *DCD Programs, Ltd. v. Leighton*,

5 833 F.2d 183, 186 (9th Cir. 1987). Accordingly, the "'court must be guided by the underlying

6 purpose of Rule 15 — to facilitate decision on the merits rather than on the pleadings or

7 technicalities.'" *Id.* (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)).

8      Four factors Courts use to determine the propriety of a motion for leave to amend are: (1)

9 bad faith; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of amendment.

10 *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th

11 Cir. 1991). These factors are not equally weighted; the possibility of delay alone, for instance,

12 cannot justify denial of leave to amend. *DCD Programs*, 833 F.2d at 186; *Morongo Band of*

13 *Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). The single most important factor

14 is whether the nonmoving party would be prejudiced as a result of amendment. *DCD Programs*,

15 833 F.2d at 186.

16 **II.**    **Discussion.**

17      Plaintiff Kingray, Inc. ("Kingray") moves for leave to file a first amended complaint that

18 would:

19      1.     Add two new subclasses of subscribers who receive NBA League Pass through a

20      cable service provider, iNDemand[5];

21      2.     Add a new class representative, Gregory Cuff;

22      3.     Correct the names under which two defendants were sued;

23      4.     Change the original class representatives' addresses;

24

25      [5]     Plaintiffs state in their motion for leave to amend that the proposed amendment

26 "does not add any Defendants." (Plts' Memo. at 5.) Again in their reply memorandum, plaintiffs state that "plaintiff simply seeks to add only new plaintiffs." (Plts' Reply at 4.) But a

27 review of the proposed amended complaint shows iN Demand as a defendant that provides "pay-per-view programming to cable companies and their subscribers." (Proposed Amended

28 Complaint at 13, ¶ 58.) Because plaintiffs have unequivocally asserted that iN Demand is not intended to be a defendant, plaintiffs shall not in their Amended Complaint name iN Demand.

1      5.     Dismiss Kingray as a named class representative.

2 Plaintiffs also contend the proposed first amended complaint clarifies the claims asserted against

3 DirecTV that were challenged in DirecTV's motion to dismiss, and more clearly specifies the

4 factual background of plaintiffs' allegations.

5      Both the NBA Defendants and DirecTV oppose Plaintiffs' motion for leave to amend the

6 complaint. The NBA Defendants argue that the amendments will cause such significant

7 disruption in the discovery process as set forth in the Case Management Plan as to result in

8 prejudice to Defendants. DirecTV asserts the proposed amendments are futile for the reasons

9 discussed in its motion to dismiss or in the alternative, to compel arbitration; will result in undue

10 delay; are made for an improper purpose; and will result in prejudice to Defendants.

11      Plaintiffs maintain they have acted promptly in filing their motion to amend even though

12 five months passed between Plaintiffs' stated intention of amending the complaint and the filing

13 of their motion for leave to amend. Plaintiffs assert they attempted to obtain Defendants'

14 agreement to allow the amendment. But Plaintiffs' desire to obtain a stipulation to allow the

15 filing of an amended complaint does not extend the reasonable time to act in seeking leave to

16 amend. Defendants have no obligation to stipulate to the filing of amended complaint

17 particularly where Defendants continue to find substantive deficiencies in the proposed amended

18 complaint.

19      Plaintiffs have been dilatory in seeking leave to amend. It became clear early on that

20 Defendants would not stipulate to the filing of the amended complaint, but Plaintiffs failed to act

21 promptly and instead postponed the filing of their motion until after DirecTV's motion to

22 dismiss was fully briefed. Notwithstanding Plaintiffs' tardiness in seeking leave to amend the

23 complaint, the Court does not find the delay to be so extreme as to be prejudicial. The Case

24 Management Plan presumably will need to be modified — a task that should not be undertaken

25 lightly — because of the filing of an amended complaint. But at an early stage of the litigation,

26 modification of the Case Management Plan can be accomplished with few significant

27 consequences.

28 ///

00cv1545

1   DirecTV also contends Plaintiffs have introduced the issue of an amended pleading for an

2   improper purpose, specifically that Plaintiffs want to avoid the filing of their class certification

3   motion.  But Plaintiffs timely filed their motion for class certification on May 8, 2001 [doc.

4   #109].  An amended complaint which adds new class representatives likely will require

5   supplemental briefing on the issue of class certification but the need for additional briefing also

6   is not a sufficient basis for prohibiting amendment to the complaint.

7       DirecTV further argues that leave to amend would be futile because the proposed

8   amendments do not remedy the deficiencies set forth in DirecTV's motion to dismiss.  The

9   Court finds it unnecessary to address in detail the parties' dispute regarding the sufficiency of

10  Plaintiffs' Section 1 claim.  When Plaintiffs amend their Complaint, they must address the

11  deficiencies set forth in the Court's Order above.  As to Plaintiffs' Section 2 claim, by failing to

12  oppose DirecTV's motion to dismiss, Plaintiffs conceded that DirecTV's argument was

13  meritorious.  Civ. L. R. 7.1(f)(3)(c).  Plaintiffs cannot now seek to amend to address the Section

14  2 deficiencies.  Moreover, Plaintiffs' proposed amendments do not salvage this cause of action.

15  Plaintiffs' additional allegations in their proposed amended complaint are as equally conclusory

16  as in the original complaint.  In a related vein, DirecTV's argument that granting leave to amend

17  will prejudice it because it will be forced to litigate claims that should be arbitrated fails.  For

18  the reasons discussed above, the Court finds the claims presented in this case are not arbitrable

19  and therefore, DirecTV's alternative motion has been denied.

20      Neither the NBA nor DirecTV argues that the addition of new plaintiff subclasses or a

21  new representative plaintiff is improper except as to timing and the need for additional

22  discovery.   Again, Defendants will not be substantially prejudiced by the addition of the

23  proposed subclasses of plaintiffs or a new class representative plaintiff.

24      Plaintiffs also seek an unconditional dismissal without prejudice of one of the named

25  class representative, Kingray, pursuant to Rule 41(a)(2) which provides:

26          Except as provided in paragraph (1) of this subdivision of this rule, an action shall
            not be dismissed at the plaintiff's instance save upon order of the court and upon
27          such terms and conditions as the court deems proper.

28  Fed. R. Civ. P. 41(a)(2).

1        The decision to grant a voluntary dismissal under Rule 41(a)(2) is addressed to the sound

2  discretion of the district court. *Sams v. Beech Aircraft Corp.*, 625 F.2d 273, 277 (9th Cir. 1980).

3  The district court must consider whether the defendant will suffer some plain legal prejudice as a

4  result of the dismissal. *Hamilton v. Firestone Tire & Rubber Co.*, 679 F.2d 143, 145 (9th Cir.

5  1985).  Plain legal prejudice may be shown where actual legal rights are threatened or where

6  monetary or other burdens appear to be extreme or unreasonable, such as where the motion for

7  voluntary dismissal came at such an advanced stage of the proceedings as to prejudice defendant

8  by waste of time and expense in preparation of defense. *Watson v. Clark*, 716 F. Supp. 1354,

9  1356 (D. Nev. 1989), *aff'd* 909 F.2d 1490 (11th Cir. 1990).  Therefore, a plaintiff's motion under

10  Rule 41(a)(2) for dismissal without prejudice should not be denied absent substantial prejudice

11  to the defendant. *Andes v. Versant*, 788 F.2d 1033, 1036 (4th Cir. 1986).

12        If the defendants make a showing of prejudice, Rule 41(a)(2) allows the court to attach

13  such terms and conditions to the dismissal as are necessary and proper to prevent any prejudice

14  to the defendants. *Id.*  Absent a showing of "substantial prejudice" to the defendants, there is no

15  articulable reason why the court, in its discretion, should not grant the plaintiff's motion to

16  dismiss pursuant to Rule 41(a)(2).

17        Plaintiffs contend Defendants refused to stipulate to the dismissal of Kingray as a class

18  representative.  Kingray, under new ownership, no longer wants to function as a class

19  representative but does want to be a member of the class because "it has sustained past injury as

20  the result of Defendants' wrongful conduct and should be able to recover for that injury as part

21  of the class." (Plts' Memo. at 6).   Plaintiffs state Defendants have "expended no time solely on

22  Kingray's behalf" and have served no discovery. *Id.*

23        But the NBA Defendants argue that Kingray should only be dismissed upon the condition

24  that Kingray provide Defendants with discovery responses that were propounded on Kingray

25  prior to Kingray's asserted interest in being dismissed.   Alternatively, the NBA Defendants seek

26  to have Kingray dismissed with prejudice.

27        The NBA Defendants believe that the reasons for Kingray's decision to withdraw as a

28  class representative may demonstrate an irreconcilable conflict among the class members that

1  could have significant implications during the class certification phase of the case.  Magistrate

2  Judge Benitez entered an order on April 3, 2001,  finding that Kingray's decision to withdraw as

3  a class representative is not appropriate for the class certification phase of the litigation.   To the

4  extent the NBA Defendants are seeking to have the Court overrule or modify the magistrate

5  judge's April 3, 2001 Order concerning discovery during the class certification phase of the

6  case, the Court declines to do so.   For the same reason, the Court will not condition Kingray's

7  dismissal upon its submission to discovery.  The NBA Defendants have not demonstrated plain

8  legal prejudice if Kingray's request for dismissal is granted.  Defendants' legal rights are not

9  threatened by Kingray's dismissal.  Nor has there been a showing of any extreme monetary or

10  other burden upon defendants if Kingray is dismissed from the action as a class representative.

11  Because there is no showing of prejudice, the Court will not affix any terms or conditions to the

12  dismissal.

13      Finally, the NBA Defendants request that if Plaintiff is permitted to amend its complaint,

14  the Court should revise the Discovery Plan.  (NBA Defendants' Opposition at 9)   Because the

15  magistrate judges are in the best position to consider modifications to discovery plans, the Court

16  declines to consider NBA Defendants' request.

17  **III.   Conclusion**.

18      Plaintiffs' motion to amend is therefore **GRANTED IN PART** and **DENIED IN PART**.

19  Based upon the Court's Order relating to DirecTV's motion to dismiss and Plaintiffs' motion to

20  amend, Plaintiffs shall file an Amended Complaint in conformity with the Court's Order as set

21  forth above.  Moreover, plaintiffs may add the two proposed subclasses of subscribers who

22  receive the NBA League Pass through a cable service provider and new class representative,

23  Gregory Cuff.  Plaintiffs may not add as a defendant, iNDemand.  Finally, plaintiff

24  representative Kingray is dismissed without prejudice and without condition.

25                                   <u>CONCLUSION</u>

26      For the foregoing reasons, having carefully considered the parties' briefs, applicable law,

27  and good cause appearing, **IT IS HEREBY ORDERED**:

28      1.    DirecTV's motion to compel arbitration is **DENIED**.

00cv1545

2.   DirecTV's motion to dismiss is **GRANTED in Part and DENIED in Part**.

a.   The first cause of action for violation of Section 1 of the Sherman Antitrust Act is **DISMISSED WITHOUT PREJUDICE** with **LEAVE TO AMEND**.

b.   The second cause of action for violation of Section 2 of the Sherman Antitrust Act is **DISMISSED WITH PREJUDICE** as to all Defendants.

c.   The motion to dismiss the third cause of action for violation of the Cartwright Act is **DENIED**.

d.   The fourth cause of action for violation of California's Unfair Competition law is **DISMISSED WITHOUT PREJUDICE** with **LEAVE TO AMEND**.

3.   Plaintiffs shall file an amended complaint that addresses the deficiencies set forth in this order on or before **July 16, 2001**.

4.   Plaintiffs' motion to amend is **GRANTED IN PART** and **DENIED IN PART**. Based upon the Court's Order relating to DirecTV's motion to dismiss and Plaintiffs' motion to amend, Plaintiffs shall file an Amended Complaint in conformity with the Court's Order as set forth above.  Moreover, plaintiffs may add the two proposed subclasses of subscribers who receive NBA League Pass through a cable service provider and new class representative, Gregory Cuff.  Plaintiffs may not add as a defendant, iNDemand.  Finally, plaintiff representative Kingray is dismissed without prejudice and without condition.

**IT IS SO ORDERED.**

Dated: _6/18/01_

M. JAMES LORENZ
UNITED STATES DISTRICT JUDGE

COPY TO:

HON. ROGER T. BENITEZ
UNITED STATES MAGISTRATE JUDGE

all counsel

31

00cv1545